IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| CECIL V. STUTZMAN ESTATE, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 120781N |
| | ) | |
| v. | ) | |
| | ) | |
| YAMHILL COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the disqualification from farm use special assessment of 18.0 acres of property identified as Account 217358 (subject property) for the 2012-13 tax year. (*See* Ptf's Compl at 4; Def's Ex L.) A trial was held in the Tax Courtroom in Salem, Oregon on May 1, 2013. Roberta Stutzman (Roberta),[1] personal representative of Plaintiff, appeared and testified on behalf of Plaintiff. Mike Crowe (Crowe) and Donald D. Stutzman (Donald) testified on behalf of Plaintiff. Jodi Bradley (Bradley), Registered Appraiser II, appeared and testified on behalf of Defendant. Jeff Ivie (Ivie), Chief Appraiser, testified on behalf of Defendant.

Plaintiff's exhibits, labeled "Item I, II, and III" were received over Defendant's objection.[2] Plaintiff offered an as additional exhibit a letter from Dan Barnhart. Defendant objected and the court excluded that letter because it was not exchanged prior to trial in the time allowed under TCR-MD 10 C(1). Defendant's Exhibits A through U were received without

---

[1] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's Decision recites facts and references to two individuals with the same last name, Stutzman. To avoid confusion, the court will use the first name of the individual being referenced.

[2] Defendant objected to Plaintiff's exhibits because they were not properly labeled under Tax Court Rule-Magistrate Division (TCR-MD) 10 B(1). TCR-MD 10 B(1) states that "Plaintiff's exhibits shall be marked numerically and have the case number on the label." Defendant moved to exclude Plaintiff's exhibits because they were not labeled in conformance with TCR-MD 10 B(1). TCR-MD 10 D states that "[a] magistrate may exclude any evidence received after the time of exchange, sanction any party who withholds information, or use any other measure the magistrate considers appropriate." After considering the matter, the court allowed Plaintiff's exhibits. Although Plaintiff failed to comply with the labeling requirement under TCR-MD 10 B(1), exclusion of Plaintiff's exhibits as a result is not an appropriate sanction under TCR-MD 10 D in this instance.

objection. Defendant's Rebuttal Exhibit V, a prior Magistrate Division decision, was admitted over Plaintiff's objection.

## I. STATEMENT OF FACTS

The subject property is 29.50 acres of land located in an Exclusive Farm Use (EFU) zone in Sheridan, Oregon. (Def's Ex A at 1.) The subject property includes "two legal dwellings and qualifies for farm special assessment homesite under ORS 308A.253." (*Id.*) On July 23, 2012, Defendant sent Plaintiff a letter disqualifying 18 acres of the subject property from farm use special assessment for the 2012-13 tax year due to "non-use." (*Id.* at 2; *see also* Def's Ex L (Ltr, July 23, 2012).) Defendant determined that 11.50 acres of the subject property qualified for farm use special assessment. (Def's Ex A at 2; *see also* Def's Ex K (map of subject property with qualified acres).) Defendant stated that the qualifying 11.50 acres were used for "two dwellings, goats, chickens, a woodlot, a garden, and a pasture area * * *." (Def's Ex A at 2.)

Bradley testified that she inspected the subject property on June 14, 2011, and spoke with Donald during her inspection. (*See* Def's Ex A at 2.) Bradley testified that she "walked the entire property and took photographs." (*See id.*; *see also* Def's Ex D (inspection form and photographs).) She observed goats and chickens, but saw no "signs of cattle" on the subject property. (*See* Def's Ex A at 2.) Bradley testified that she informed Donald that the subject property was "underutilized" and that 1,000 pounds of animal units per acre were required. On July 5, 2011, Defendant sent a letter to Plaintiff stating "that the property may not qualify for farm special assessment and that an appraiser would be re-[in]specting the property after January 1, 2012 to verify farm use." (*Id.*; *see also* Def's Ex E (July 5, 2011, letter).) Bradley testified that Defendant did not receive a response to its July 5, 2011, letter.

/ / /

Bradley testified that she inspected the subject property again on February 27, 2012, and, during that inspection, spoke with Roberta. (*See* Def's Ex A at 2.) She testified that she told Roberta that the subject property was underutilized. Bradley reported that she saw no cattle or "signs of cattle" on the subject property during the February 27, 2012, inspection. (*See id.*) "On March 13, 2012, [Defendant] sent a letter to [Plaintiff] advising [of] the intent to disqualify the [subject] property from farm special assessment for non-use * * *." (*Id.* at 3; *see also* Def's Ex I (Ltr, Mar 13, 2012).)

Bradley testified that Roberta visited Defendant's office in April 2012 and provided a letter to Defendant at that time. (Def's Ex J (Ltr).) The April 2012 letter from Roberta stated:

> "We are currently in the middle of making changes on the property which includes my son taking over [and] starting an orchard. Plus, we are going to grow the Himalayan Blackberry for market. Every year there is at least 1000# of berries taken off this property, plus the fact that everything about that berry plant is good for humans, animals [and] wildlife! The root [and] bark is good for medicine, the leaves for a healthy tea [and] of course the berries for food for all!"

(*Id.* at 1 (emphasis in original).) Bradley testified that Roberta provided some notes regarding cattle on the subject property, including the statement "2006-2010 Run 30 head of cattle." (*Id.* at 14.)) Bradley testified that Roberta did not provide a lease, a Schedule F,[3] or any other documentation regarding cattle on the subject property. She testified that Himalayan blackberry is a "B list" noxious weed in Oregon that ruins pasture land; growing Himalayan blackberry is not an accepted farming practice. (*Id.* at 18-23.) Bradley noted that the Oregon Department of Revenue Farm Use Manual describes an "[u]nacceptable farm use practice" as "[l]and is engaged in a farming practice where the mode of operation is not common with farms of a similar nature." (Def's Ex K at 3.)

---

[3] Bradley testified that Roberta provided handwritten 2011 and 2012 Schedule F forms at the request of Defendant. (Def's Ex S at 5-6.) Bradley testified, and Roberta agreed, that Roberta did not file Schedule F forms with the Internal Revenue Service for the 2011 and 2012 tax years. (*See* Def's Ex P at 2.)

Bradley testified that she printed "Google earth" maps of the subject property with images dated July 6, 2012; August 1, 2011; June 29, 2005; May 27, 2004; and May 6, 1994. (Def's Ex T at 1-5.) Bradley testified that, in the 1994 image, the subject property appears to be managed in accordance with acceptable farming practices. (*Id.* at 5.) She testified that, in all of the subsequent images, much of the subject property is overgrown with blackberries. (*Id.* at 1-4.) Bradley noted that, in the 2012 image, the subject property includes distinct dirt tracks that have been cleared. (*Id.* at 1; *see also* Def's Ex U (aerial photograph of the subject property).) She testified that it is unclear whether those dirt tracks were created by a caterpillar or by an all-terrain vehicle (ATV) or some other vehicle. Ivie testified that he talked with Roberta on October 3, 2012, when she visited Defendant's office. (*See* Def's Ex P.) He testified that, during that conversation, he asked Roberta "about the motorcycle tracks that could be clearly seen in the 2012 aerial [photograph]. She said that those were made by her grandson over four different days * * *. She also stated that they were made by a bulldozer. She did admit that motorcycles were run on the property by her grandson." (*Id.* at 2.)

Donald testified that he bulldozed the subject property, but he did not intend to create a racetrack. He testified that the grandchildren came to the subject property and rode ATVs or motocross "maybe once a month." Upon further questioning by Roberta, Donald changed his testimony to agree with Roberta that the grandchildren rode motocross and ATVs on the subject property with less frequency than he had previously testified.

Roberta testified that cattle grazed on the subject property in 2011 and 2012. (Ptf's Ex I.A (three photographs from July 2012 showing cattle grazing); Ptf's Ex 2-II ("cattle 2011 summer late evening").) She testified that cattle have grazed on the subject property since 2006. Roberta testified that, in 2011, there were 96 "animal units" on the subject property and,

in 2012, there were 77 "animal units" on the subject property. She testified that the cattle belong to Dan Barnhart (Barnhart), who is married to Roberta's granddaughter. Roberta testified that Crowe, her grandson, managed the cattle for Barnhart when the cattle were on the subject property. She testified that, depending on the weather, the cattle were on the subject property for four to five months each year starting in May or June.

Crowe testified that he owns tax lot 800, which is adjacent to the subject property. (*See* Def's Ex U.) Roberta testified that there was and is no fence between the subject property and the adjacent tax lot 800. (*See id*.) She testified that the cattle were able to walk freely between those two lots. Roberta testified that there is an electric fence along the south and east perimeters of the subject property. Crowe testified that he mowed the south and east edges of the subject property to prepare for electrical fencing.

Crowe testified that Barnhart paid him to manage cattle on both Crowe's property (tax lot 800) and on the subject property. He testified that Barnhart "rented" the pasture land on tax lot 800 and the subject property. Crowe testified that Barnhart paid rent based on the number of head of cattle. He testified that the cattle were typically on tax lot 800 and the subject property beginning in May or June of each year and stayed until October or November. Crowe testified that the average number of cattle was 30 head of cattle per year. He testified that he employed a method of "rotational grazing," in which he moved the cattle between about six different "paddocks" separated by electric fences. Crowe testified that the grasses would dry out by August or so each year. He testified that he agrees Himalayan blackberry is a noxious weed, but the cattle will eat it. Crowe testified that some customers prefer beef from the cattle that ate blackberries. He testified that he does not want to spray the blackberries while cattle are grazing on the blackberries.

Roberta testified that it has been difficult to clear blackberries from the subject property. She testified that she prefers organic gardening techniques and would prefer not to spray the blackberries. Roberta testified that, in 2011, the blackberry vines were cut. She testified that the vines were sprayed in 2012. Roberta testified that, for a time, Donald considered growing blackberries in rows, but he is now considering an orchard.

## II. ANALYSIS

ORS 308A.062(1) states that "[a]ny land that is within an exclusive farm use zone and that is used exclusively for farm use shall qualify for farm use special assessment under ORS 308A.050 to 308A.128, unless disqualified under other provisions of law."[4] "Farm use" is defined in ORS 308A.056(1) as "the current employment of land for the primary purpose of obtaining a profit in money by" one of a number of statutorily enumerated farming and farm-related activities, including "[f]eeding, breeding, managing or selling livestock * * *." ORS 308A.056(1)(b). "The use of the word 'current' [in ORS 308.056(1)] refers to the present use of the land and suggests that the past or future use is largely irrelevant. The word 'employment' suggests an active, purposeful, directed use of the land." *Everhart v. Dept. of Rev.* (*Everhart*), 15 OTR 76, 79 (1999). "[T]he use of the land must be 'for the primary purpose of obtaining a profit in money.' That phrase looks to the intent of the user of the land. Inasmuch as intent is a subjective state of mind, it must be induced from objective observable conduct." *Id.* at 79-80. The taxpayer need not actually make a profit when the land is in the EFU zone. *See id.* at 80.

/ / /

/ / /

---

[4] All references to the Oregon Revised Statutes (ORS) are to 2011.

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). If the evidence is inconclusive or unpersuasive, Plaintiff will have failed to meet its burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

The county assessor is required to disqualify land in an EFU zone "upon the discovery that the land is no longer being used as farmland[.]" ORS 308A.113(1)(a). As required by ORS 308A.113(1)(a), Defendant disqualified 18.0 acres of the subject property from farm use special assessment for the 2012-13 tax year based on its discovery that that portion of the subject property was no longer being used as farmland. Plaintiff challenges the disqualification, asserting that the disqualified portion of the subject property was used as farmland. The evidence and testimony presented by Plaintiff at trial focused primarily on use of the subject property for cattle grazing. Evidence submitted by Defendant indicates that Plaintiff previously took the position that the subject property was in farm use based on cultivation of Himalayan blackberry. Roberta testified regarding future plans to plant an orchard on the subject property.

A.     *Cattle grazing activity on the subject property*

Roberta and Crowe both testified that the subject property was used for cattle grazing in 2011 and 2012. Crowe testified that he managed cattle for Barnhart on both the subject property and on his own property, which is adjacent to the subject property. Crowe testified that cattle were on the subject property from May or June until October or November. Bradley testified that she visited the subject property in June 2011 and again in February 2012 and saw no "signs of cattle" on either visit.

"[T]he owner of the property does not have to personally farm the property. A tenant farmer (whether a lessee, renter, sharecropper, or otherwise) may use the land and thereby qualify the land for special assessment." *Everhart*, 15 OTR at 81. Thus, any bona fide farm use of the subject property by Barnhart and Crowe could qualify the subject property for farm use special assessment even though neither is the subject property owner. Grazing cattle is undoubtedly an activity that could qualify for farm use special assessment. The question here is whether Plaintiff has proven by a preponderance of the evidence that the subject property was used for cattle grazing and that the cattle grazing activity on the subject property was "active, purposeful, directed[.]" *See Everhart*, 15 OTR at 79.

> "It is imperative to note that the farm use provisions * * * were not designed merely to provide tax relief to those who mechanically follow some statutory minimum. Rather, the legislative policy is to stimulate the retention of currently productive farmland for agricultural use; to retard the diversion of agricultural land to other uses; and to stimulate adoption of these policies by providing a tax benefit to those who seek income by using the land for farm purposes only."

*Beddoe v. Dept. of Rev.*, 8 OTR 186, 189 (1979) (citations omitted). "The 'day-to-day activities' rather than a few months each year must be directed at achieving a profit." *Ameral v. Dept. of Rev.* (*Ameral*), 14 OTR 56, 60 (1996) (finding the "[t]axpayer's land was used only two to three months each year for farm use, which is insufficient to qualify for special assessment").) In *Baker v. Jackson County Assessor*, TC-MD No 000978F at 3, 6 (July 6, 2001), the court found that use of property for open range cattle grazing "one or two months each year * * * was not sufficient to qualify it for farm use special assessment."

The court accepts the testimony of Roberta and Crowe that cattle grazed on the subject property for some period of time in 2011 and 2012. The extent and duration of the cattle grazing activity on the subject property is unclear. Roberta and Crowe both testified that cattle were on

the subject property beginning in May or June each year.  However, Bradley visited the subject property in mid-June 2011 and saw no cattle or "signs of cattle."  The cattle grazed on the subject property reportedly belonged to Barnhart.  Unfortunately, Barnhart did not testify at trial or provide any evidence of his cattle grazing activities, such as his federal Schedule F.[5] Additional evidence indicates that the subject property was used for nonfarm activities.  Roberta conceded that "motorcycles were run on the property by her grandson."  Donald also testified that the subject property was used for ATVs and motocross, but gave conflicting testimony as to the extent of those uses.  The court is not persuaded that cattle grazing on the subject property in 2011 and 2012 qualified as "farm use" for purposes of farm use special assessment.

B.      *Cultivation of Himalayan blackberry on the subject property*

In correspondence with Defendant, Roberta described efforts to cultivate Himalayan blackberry on the subject property.  Crowe testified that the cattle enjoy eating the Himalayan blackberry and it may improve the flavor of the beef.  Bradley testified and provided evidence that Himalayan blackberry is classified in Oregon as a "B-list noxious weed" and that cultivation of Himalayan blackberry is not an "accepted farming practice."[6]  This court has held that allowing the growth of Scotch broom, a "designated noxious weed," is "not an accepted farming practice" despite cattle grazing on the property and despite the fact that Scotch broom "may fix nitrogen in the soil * * * after the plant dies."  *See Pratt v. Polk County Assessor*, TC-MD No 021204F, WL 21384605 at *1, *2 (June 12, 2003).  The court finds that, to the extent Plaintiff

_____

[5] Roberta testified that Barnhart is the one with farm income and he would have provided his federal Schedule F, but he was never asked by Defendant to provide his Schedule F.

[6] "Accepted farming practice" is defined in ORS 308A.056(4)(a) as "a mode of operation that is common to farms of a similar nature, necessary for the operation of these similar farms to obtain a profit in money and customarily utilized in conjunction with farm use."

sought to cultivate Himalayan blackberry on the subject property, that activity does not qualify as "farm use" for purposes of farm use special assessment.

At trial Roberta and Crowe both described efforts to remove blackberry from the subject property, including cutting and eventually spraying the vines. Qualifying "farm use" includes "[i]mplementing a remediation plan previously presented to the assessor * * *."[7] ORS 308A.056(1)(h). Here, there is no evidence that efforts to remove blackberry from the subject property are part of an approved remediation plan. Removing blackberry vines does not otherwise meet any of the qualifying "farm uses" enumerated in ORS 308A.056.

C.      *Future plans for a fruit orchard on the subject property*

Roberta testified and stated in written correspondence that Donald was considering planting an orchard on the subject property. As the court stated in *Everhart*, "[b]y looking only to the 'current employment' of the land, the law ignores the past, and any intentions with regard to future use." 15 OTR at 81. Any planned future use of the subject property is irrelevant to whether the subject property qualifies for farm use special assessment for the 2012-13 tax year.

## III. CONCLUSION

After careful consideration, the court finds that Defendant properly disqualified 18.0 acres of the subject property from farm use special assessment for the 2012-13 tax year. Plaintiff

/ / /

/ / /

/ / /

/ / /

/ / /

_____

[7] A "remediation plan" is "a plan certified by an extension agent of the Oregon State University Extension Service to remediate or mitigate severe adverse conditions on farmland." ORS 308A.053(5).

failed to meet its burden of proof that any of the activities on the subject property in 2011 or 2012 qualified as "farm use" under ORS 308A.056(1). Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of June 2013.


_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on June 21, 2013. The Court filed and entered this Decision on June 21, 2013.*